Good morning, Tracy Dressner for Petitioner Lomel Hamilton. Welcome, Judge Watford. I'm a little nervous now, Friday the 13th in a full courtroom. I'm not sure if that's a good or bad beginning. Everybody's a little nervous standing there, so just get your bearings on time. This case really involves whether the state court applied clearly established United States Supreme Court law in an objectively unreasonable manner when it upheld the admission of Mr. Hamilton's second statements, given that Mr. Hamilton had invoked his Miranda rights the day before and they had been repeatedly ignored. You have a difficult burden here because, if I understand correctly, your client initiated the conversation that resulted in or manifested itself in that confession. Am I correct? He was in jail, in prison or in jail. He was incarcerated in any event. He was in jail. It was actually his wife or his girlfriend who initiated the call, although it was a three-way call involving Mr. Hamilton at the jail. You're right. Mechanically, I gather she sort of initiated the call, but it was his initiative in the sense that he's the one who wanted to talk to the officer, right? Correct. Well, we don't know that he's the one who wanted to talk to the officer. The family had safety concerns, the three of them, Mr. Hamilton, his mother and his wife. All three had safety concerns about what had occurred the day before. But even factually, if you assume that that was an initiation, there's a legal definition, which is a desire on the part of the accused to open up a more generalized discussion about relating directly or indirectly to the investigation. And that wasn't at all what this was. When you read the two transcripts together, it was a follow-up to Mr. Hamilton's safety concerns. Mr. Hamilton, not only in admitting his own involvement in the murder, he had snitched on the big homie, the man who had directed him to do the killing. And the victim that they had, that Mr. Hamilton, the victim in this case, was shot at the behest of the big homie because she had snitched on another homie. So there were some very legitimate safety concerns about what happened after Mr. Hamilton confessed, after he repeatedly invoked his right to counsel and it was ignored. The state court found that that was a coerced confession, would not have admitted it if the prosecution had tried to. The state trial court found that the first confession was involuntary? Is that what you're saying? Well, he said it was coerced. He said, and that's on page 185 of the excerpts of records, where he says the failure to adhere to an invocation of rights is a form of coercion. And he says very clearly, I would not have admitted this had you tried to admit it. You've argued that the first confession was actually involuntary, right? I have argued that. It was never actually litigated because they never tried to admit it. But you have not only the repeated ignoring of the request for counsel, he also says repeatedly book me, which is, in essence, get me out of here. But there's also, you know, they repeatedly are talking about how if he just tells them exactly the scenario, the teenager does the shooting at the request of the big homie, it's not 25 to life. It might be 10 or 15 to life. You're going to go down, but you might do better. So there's all this other pressure put on him. We'll get you safety. We'll take care of your family. There's all these other implied promises that go along with the failure to honor his invocation. Well, let me ask you this. I read the transcript, and I'm not sure I agree with that characterization. Is there anything on the tape of the interrogation? You know, I never listened to the tape, and I don't believe that anyone other than the trial court listened to those. I know there had been a discussion a couple of weeks ago with the court about getting those tapes. I do not believe the state appellate court ever listened to them, and I know the district court never listened to them. The judge does, in his discussion, talk about things that the court believes was going on that you can't get sort of outside the tape, but there's not really any detail. And unfortunately, the trial court judge really makes no findings here. He simply says, I find it was a separate and independent conversation, cites a couple of state court cases, and provides nothing further to go on. But there's no indication from Mr. Hamilton that he's trying to open up a generalized discussion. He's concerned about safety, and he hasn't been able to exactly tell his mother and his sister. But you can't hang up at any time, right? But that's really not the issue. The issue is, once he and... It's a fact, though. He could have hung up, but that really has nothing to do with the issue that's before the court. I sort of think it does, so maybe you better explain to me why it doesn't. It's one thing if he's in a little room with a locked door, with two guys hovering over him, and not giving him water, you know, all the things that happen, and you say, well, he had to sit there and listen to questions and answer them or ignore them or whatever. But if he can go click and stop the conversation, how is that... Because this was not in isolation. The day before, Mr. Hamilton invoked his right to counsel. And the United States Supreme Court says, once you invoke your right to counsel, they cannot reinitiate any... There can be no reinitiation of questioning unless there's initiation by the... By the defendant and a knowing and intelligent waiver of your rights. We have no knowing and intelligent waiver of Mr. Hamilton's rights. What's the U.S. Supreme Court case that you contend compelled the state court to find? Smith v. Illinois and Oregon v. Bradshaw. In multiple Ninth Circuit cases, which I cite in my briefs, that say that there's a two-part requirement for this. We have a case where a teenager, Mr. Hamilton was 18 at the time he was being interrogated, he invokes at least four times his right to counsel, not to mention saying, booking it, arguably being an invocation of I'm done talking to you. And it's repeatedly ignored. The next day, how do you then ever find a waiver of your rights? This is a guy who the take-home message is, I have no rights. They tell me I have rights. I get advised of my rights. I invoke my rights. They repeatedly ignore them until I finally confess. Why would you think you have any rights left to waive the next day? There's just nothing in the scenario from which you can construe a knowing and intelligent waiver. Moreover, the reason they called, and it's clear from the beginning, they're calling about safety. There's nothing that says why do they have to go over the details of what Mr. Hamilton said the day before in order to satisfy the family's safety concerns. You don't have Mr. Hamilton giving this wide-ranging discussion of what happens. You have the officer who violated his rights repeatedly the day before spoon-feeding back to him the very same words that he had used the day before and just having Mr. Hamilton say, yeah, yeah, yeah, no, I didn't say that, yeah, yeah, yeah, yeah. That is not an open invitation to a generalized discussion. That is his being interrogated again and agreeing. My understanding is that he allowed the officer to repeat his earlier confession because he was trying to relay to his wife and his mother what he had said the day before. Well, he was trying to assuage the safety concerns again, which they had promised him the day before. That's why this is inextricably bound up with what happened before. You can't divorce the statements that they're talking about were in violation. Had he never been unconstitutionally interrogated the day before, there would have been no details to give to the family. So how you separate those out is beyond me. And there's no surprise. When you look at the tape, the detective, it appears to me that the detective was expecting the phone call, that they were expecting to deal with the safety issues. It starts right off with you have some safety concerns, where's your mom living now, where's your wife living, we've got to do something. There's nothing more that Mr. Hamilton said in that second conversation, in that second interrogation, than had took place the day before. There was no opening new discussion. So that's an initiation step. And just knowing an intelligent waiver, I just don't see it. Where can you find anywhere on this record that after he invoked four times and had it ignored, that he ever knew that he had rights and was waiving them? In fact, what he knew was he didn't have rights. Now, whether the police had to have Mirandized him that time, whether he was actually in custody in the jail, it doesn't matter. If you are trying to do the right thing and you want to make sure that what he's telling you now is scrupulously within the Constitution, you Mirandize and make sure that he understands that he has a right to counsel when he's talking to you then. And the detective doesn't do that. And why? We can all speculate, but, boy, I bet that detective knew that he had violated his rights the day before. You gave us Smith v. Illinois. What was the other case you gave? Oregon v. Bradshaw. Okay. Smith specifically says that it deals with the first issue, whether Smith invoked his right to counsel in the first instance. In Oregon, you think Oregon? Oregon v. Bradshaw. What's the second point? I have the exact page numbers. If I can save my remaining time for rebuttal, I can give them to you. What's the number on Oregon? I'm sorry? The page number or the site? The site. The specific page. Oh, I have it in my brief, and I can give it to you in my rebuttal if the court would give you a couple minutes. All right, so I will save the remaining time for rebuttal. Thank you. Okay, we'll hear from the warden. Good morning, Your Honors. May it please the Court. Senior Assistant Attorney General Lance Winters for the Respondent and the Warden in this case. Your Honors, first addressing the point about the fact that Petitioner was calling from county jail, I think that informs all the questions in this case, but one that it most directly confronts is the question of custody in this case. And that's one of the reasons why the California Supreme Court or, excuse me, California Court of Appeals' rejection of Petitioner's claim was not an unreasonable application of Supreme Court precedent. That is, there was no custody. The test for custody is whether a reasonable person would feel free to terminate the conversation at any time. Clearly, Petitioner, who was on a pay phone from county jail talking to a detective across town in another office, could terminate the conversation at any time. All he had to do was hang up the phone. Let me ask you this, Counsel. Do you concede that the officers violated the law during the first confession? Of course, Your Honor. Yes. They did so knowingly, right? I believe so. Well, I have nothing to suggest otherwise. Okay, were they disciplined for that, do you know? I do not know. Probably more likely that they were rewarded for their good police work here, don't you think? You know, my knowledge of the inner workings of the police department on those sorts of things is extremely limited, such that I could not really answer that. If we were to affirm here, why in the world would any police officer ever respect a defendant's invocation of his right to counsel? Well, I think your question goes to the deterrent effect of the exclusionary rule. And I don't think that's really at play here by allowing the admission of the second conversation. Because what you would be saying is that police officers might be encouraged, if we uphold this, police officers might be encouraged to question suspects, even pass their invocation of the rights, with the hope that maybe later they will call us on the phone, make incriminating statements, and then we can get that statement admitted. I don't think police officers are going to think in those terms. Well, in cases in which there's a safety concern, and they promise the prisoner that he will be moved somewhere where he'll be safe, then it's very easy then to get the confession by not doing it. Then he has to make an inquiry about his safety. Yes, but the notion that this inquiry would happen over the phone where he could terminate the conversation. Well, he's not going to come into the office. I'm sorry? He's not going to come into the office. Well, oftentimes officers visit inmates in county jail. I believe that's the circumstance of the first conversation at issue in this case. But in addition, they will no doubt see the officers in court when they appear in court. I mean, this individual hadn't even been arrested on this offense yet, much less booked, much less appeared in court for the murder in this case. He was in custody on a completely unrelated case. Well, let's say, I mean, there's some other reason that he needs to talk to the officer. Let's say all of a sudden he gets an appendicitis attack. Let's say he's a diabetic and needs his medicine or something of that sort. So he arranges for the family to make a call to talk to them about that, and the officer then starts asking him questions about the crime and essentially sort of says, if you want your medicine, you better tell us everything you told us yesterday again. So I'm a little, you know, he can't really hang up the phone because he's got, you know, his medical need. In this case, the analogy is that he is afraid to go back to his cell because he might get, I don't know, beaten, killed, you know, whatever happens to a gang member who snitch. And so he can't really get off the phone, and the officer is asking him these questions. Why isn't that, I mean, where here is the, why isn't that interrogation? Well, it might be interrogation, but I'm not arguing about interrogation. I'm arguing about custody, and I still think it would not be custody for purposes of Miranda. It might, however, be involuntary in those sorts of circumstances where you lay out where the, you know, it's sort of like if you want to live because I'm not going to get you your insulin unless you confess, now we're getting into the territory of a due process violation for an involuntary statement. But I don't think it's a Miranda violation in the same sort of phone call conversation because there is no custody. Turning to the other points that Petitioner has made. I'm sorry. Of course. We're talking about Miranda. We're talking about the right to counsel here, aren't we? Yes. He invokes his right to counsel. He still wants to talk about his fear, right? Right. He can't really get off the phone so easily. He can't just hang up and say, I don't feel like talking today because he's got, you know, the threat of the gang members punishing him. And the officer is asking him questions about the crime. Why isn't that the sort of equivalent of restarting the conversation? You know, even though he made the initial phone call, he made the phone call about safety. He didn't really want to talk about the crime. And then the officer sort of uses that leverage to get him to talk about it. Well, I think I question your premise, which is that the only thing he wanted to talk about was his safety. I think what he wanted to do was communicate to his family what he had said about the crime so that they would have informed information. He didn't need the police officer on the line for that. If he wanted to communicate to his family, why didn't he call his family? Well, that's not what he said. He said he couldn't tell them on the phone because there were other people around him in county jail. That's why he called the police officer. In fact, when the police officer says, did you explain to your family what you said, the wife says, no, he couldn't really do that because he's got other people around him. And petitioner responds, so that's why I'm not, so won't you, I'm letting you, I'm giving you a chance. He says this to the detective. He wants the detective to tell his family what he said. And the detective then asks petitioner what he said to confirm the statement so that the family will know that petitioner made the statements. That is a discussion of the crime. It's related to his safety concerns, and more particularly the safety concerns for his family because he wants his family to know that he has essentially informed on another gang member and that might endanger them, but that is part of a generalized discussion of the offense. And he initiated that conversation, and that's why there was, why the, excuse me, the California courts. I don't think that's what it shows. It shows that he hasn't told them what he plans on doing, not on what you did. And the detective said, why don't you tell them what you plan on doing? That's true. It was perspective, but the point is that he has made this statement, and he is going forward. He is going to be arrested for a murder as a result of his statements. That's what he plans on doing? He plans on getting arrested? Well, that was the effect of his statements. This was part of, I mean, plan is a loosely used word in this context, I think. In his own mind, he doesn't know what we all know now, and that is that his first confession is invalid. He's calling having, in his mind, confessed, so there's no harm in repeating it all again, because after all, he's on the hook. So why isn't this a cyber situation, where the police essentially are building on a, what they must have known was a bad confession, to extract from him what is now being held to be a valid confession? Well, there's, I'm not exactly familiar with Siebert, but I believe it's probably the same as Oregon v. Elstad, where we're talking about how a second confession is tainted by a first confession. And that's not been the claim in this case. And I would take issue with Petitioner's assertion that the trial court found that the first statement was coerced. I don't believe that is supported by the record. It was inexcusable. It was impermissible. It was in violation of his right to counsel. But there's nothing to suggest it was involuntary. Certainly there were coercive elements to the interrogation, as there are in every interrogation. But that did not make it involuntary, and nor was the second. I see my time is up. If I may just conclude my statement. It was bad. There's no doubt about it. It was bad. And he didn't know it's bad. So when he calls in, he figures the game's up. He's already incriminated himself. So an officer doesn't give him a second set of Miranda warnings, doesn't say, And by the way, buddy, if you're going to talk, you should be aware that, you know, let me read you your rights once again. He certainly doesn't tell him, by the way, the confession he gave us yesterday, we can't use it against you. We might be able to use it against somebody else. You're right. You know, you have your problems now and all those things. Your recapitulation of the facts is accurate. Absolutely. So does the failure to give a second set of Miranda warnings, I mean, I think that's what Counselor's arguing. This is sort of a continuation of the whole thing. He doesn't know it's a bad confession. He doesn't know he's got a fresh start and that he's now, now is when he's stepping into it by doing this phone call, right? Right. He's calling about safety. He wants to secure the safety of his family. In a sense, the officer plays on that by making it. I realize my time is up. If I may just make two brief points. One, I think the initiation was shown in here because there was a generalized desire to open up a discussion about the crime. That was integral to the discussion about the family's safety. And as to the waiver aspect, I believe Petitioner did knowingly waive his rights. He was familiar with his rights. He knew he could talk to, he had 24 hours intervening between the two conversations. He had spoken to his mother the night before. He was on the phone with his mother and wife. He knew he was proceeding in a conversation without an attorney present. And as Petitioner conceded, he knew he had that right. And since he went forward without it, he knew he was waiving it. Thank you. Thank you. You may have a minute for a button. I did not concede that he knew he had the right. In fact, what had occurred the day before clearly told him he had no rights. They told him he had rights. He invoked them. They ignored him. He had no reason to believe that he had ongoing rights. You can't look at the second statement in isolation. If that was the only thing that ever came in and the day before hadn't happened, the fact that he could hang up, the fact that he was in jail, all that might make a difference. But you can't. This was a continuation. Nothing new came out of that second statement. It was merely repeating what he had said the day before. Exactly. To the T. Word for word. Nothing new. And there's no way to divorce what happened that second day from what happened to the first day, which was illegal. Wasn't that also true in our decision in Soleil? The issue in Soleil, and I've looked at it quite extensively, is there's no details about what happened. There's no details about what was said in the interrogation. What we do know is that they said that it was a technical violation of Miranda the first day, and they don't explain what it is and that he never asserted that the statements that were technically in violation of Miranda were involuntary. And that is not the case here. From the first day, from when they were arguing this in the trial court, Mr. Hamilton has maintained that those statements that first day were involuntary. They were coerced. Part of the coercion was their failure to abide by his invocation. It was also the promises, the safety issues, the other things. In my last remaining seconds, I can give you the sites to Bradshaw. It's 462 U.S. at 1044. The Smith v. Illinois pinpoint site is 469 U.S. at 95. And I would also add in the Edwards case, which is at 451 U.S. at 486 in footnote 9. Thank you. Okay, thank you. The case is signed. You will stand for a minute.
judges: Kozinski, Reinhardt, Watford